IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

REBECCA McCURDY,

    Plaintiff,

vs.                                                1:04-CV-155(WLS)

FORD MOTOR COMPANY,

    Defendant.

## ORDER

Presently pending is Defendant's motion for summary judgment (Doc. No. 36) and Plaintiff's motion for a hearing on said motion. (Doc. No. 41). For the following reasons, Defendant's motion for summary judgment (Doc. No. 36) is **DENIED** and Plaintiff's motion for a hearing (Doc. No. 41) is **DENIED.** As the parties have more than adequately articulated their positions on the motions, the Court finds that a hearing is unnecessary. Accordingly, Plaintiff's motion for a hearing (Doc. No. 41) is **DENIED.**

## BACKGROUND

This is a product liability case in which Plaintiff alleges that a defective "sway bar link system" was the cause of her accident while driving her 1995 Ford Explorer. As a result of the accident she incurred various damages and injuries, to include, but not limited to, medical expenses exceeding $75,000.

## THE ACCIDENT

On October 19, 2002, Plaintiff McCurdy was driving her 1995 Ford Explore east on Georgia State Route 32. The vehicle, for an unknown reason, drifted onto the right shoulder of the road. Plaintiff attempted to correct by cutting the wheels to the left and then the right in compliance with the classic driving recovery move. Instead of straightening up, the vehicle went into a counter-clockwise "yaw" resulting in a rollover. As a result of the crash, Plaintiff incurred severe injuries. Plaintiff alleges that crash was caused by a defective stabilizer bar linkage that had broken.

1

## **THE ALLEGED DEFECT**

The parties agree that the subject 1995 Ford Explorer was equipped with a "stabilizer bar" that was part of the front end suspension system. The stabilizer bar consisted of a "bow shaped bar that extended nearly the width of the front end of the vehicle. The stabilizer bar was attached to the steering control arm on each front wheel assembly by a shorter vertical linkage bar that connected the steering control arm and the stabilizer bar. The linkage bar or "stabilizer linkage bar" was 8mm in diameter.

Plaintiff contends that her 1995 Ford Explorer had a defective stabilizer linkage bar. According to Plaintiff, the stabilizer linkage bar had broken and fallen off the vehicle sometime prior to the accident. McCurdy maintains that the linkage bar was undersized and unable to handle the stresses of normal operation of the vehicle.

Ford became aware of problems with the stabilizer linkage bar as early as 1997. On September 20, 2000, the National Highway Transportation Safety Agency (NHTSA) launched an investigation into the failure of the linkages. The investigation was designated as PE00-039 and specifically examined the reports of the failure of the front stabilizer bar links on 1995-1996 Ford Explorers. On November 8, 2000, Ford replied to the NHTSA regarding the investigation and acknowledged that Ford's own investigation had revealed that the stabilizer bar link stud could fracture from bending fatigue at approximately 50mm below the head of the stud. Ford agreed to conduct further tests on the parts by November 22, 2000.

In response to interrogatories sent by NHTSA, Ford made certain admission related to the alleged defect. Ford admitted that (1) it had received a large number complaints related to the defects; (2) that it had replaced the 8mm linkage with a 10mm linkage after post production tests; (3) it had received a report from one survey conducted by NHTSA that 50% of the Explorers examined either had broken or replaced links; (4) the majority of warranty reports found a broken or missing links when the vehicle was examined for noise or steering problems; (5) over 6,000 warranty claims had been made for broken or defective links; (6) over 15,000 warranty claims that could be attributed to the stabilizer bar linkage or something similar; and, (7) testing that showed that a 1996 Explorer with at least one linkage

2

disconnected failed to "meet Ford's extremely severe limit handling criteria." In addition, Ford provided a narrative describing the conditions in which it was found the link failed and a driver's likely experience when a failure occurred.

On November 28, 2000, Ford notified the NHTSA that it would initiate a "Safety-related recall" to replace the 8mm linkage with a new 10mm linkage in approximately 810,000 vehicles. In that notification Ford did not admit that failure of the stabilizer or link caused a loss of control, but did admit "that vehicle handling could be affected at extreme limits." Plaintiff testified that during the eight to nine months prior to the accident that the vehicle swayed and seemed to be off balance when she hit a bump.

## DISCUSSION

Defendant filed the instant motion before the Court modified its rule concerning summary judgment and <u>Daubert</u> motions. Since this motion was filed, the Court requires litigants to file <u>Daubert</u> motions and summary judgment motions as separate motions. The reason being is that the standards for resolving the two motions are different, and as is argued by Defendant in this case, the resolution of the <u>Daubert</u> motion has serious implications upon the resolution of the motion for summary judgment. As such, the Court will treat the instant motion as two separate motions: (1) a <u>Daubert</u> motion, and, (2) a summary judgment motion.

## I. DAUBERT MOTION

Defendant has moved to bar the opinion of Plaintiff's expert, Dr. George Flowers, regarding the existence of a defect in the stabilizer bar linkage and the causal relationship between the defect and the automobile accident. Essentially, Dr. Flowers opined that (1) the design of the links made them susceptible to bending fatigue fracture; (2) failure of one or more of the links makes driving the car unstable and susceptible to rollover during extreme steering maneuvers; and, (3) it is highly probable that the failure of the sway bar link in Plaintiff's vehicle strongly contributed to the accident.

Expert testimony is admissible if (1) the expert is qualified to testify regarding the matter he intends to address; (2) the methodology he uses to reach his conclusion is

3

sufficiently reliable; and, (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chemical, Inc., 158 F.3d 548, 562 (11th Cir. 1998). The court of appeals reviews a district court's decision to admit or exclude expert testimony for an abuse of discretion. City of Tuscaloosa, 158 F.3d at 556.

Defendant attacks Plaintiff's expert, Dr. Flowers, under all of the prongs of the above referenced test. Defendant argues that Flower's methodology and opinion are unreliable as mandated by Daubert and as such fails to assist the jury.

Rule 702 of the Federal Rules of Evidence provides in pertinent part that an expert may testify:

> if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Civ. 702.

This Court is well aware of its obligation to ensure that scientific testimony is both relevant and reliable. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). The Court is also aware that the problem that the Supreme Court was trying to address in the Daubert line of cases was the so called "junk science" that was being admitted by trial courts. Essentially, new and novel, but untested, scientific theories used by some litigants to support their cases. As a result, the Supreme Court set forth the requirements that the expert's opinion was supported by a scientifically valid theory, reasoning or methodology and could be properly applied to the facts of the case. Daubert, 509 U.S. at 593.

In addition, the Daubert court set forth a guide of non-exclusive factors for the trial courts to examine in making this determination. The district court should examine (1) whether the expert's theory is capable of being, and has been, tested; (2) whether the methodology has been subject to peer review; (3) what the known rate of error is; and, (4) whether the theory is generally accepted by the scientific community. Daubert, 509 U.S. at 593-94.

4

In the present case, Defendant maintains that Dr. Flowers is not "qualified to testify regarding the matter he intends to address." Both parties agree that Dr. Flowers is a Professor at Auburn University and has taught at the university for 15 years. Flowers holds a Bachelor of Science degree from Auburn University in mechanical engineering and a Doctorate degree from the Georgia Institute of Technology, also in mechanical engineering. He has authored thirty-two (32) articles for various engineering publications. Flowers has authored or co-authored forty-eight papers and presentations for engineering conferences. In addition, he is a full member of the Society of Automobile Engineers.

Dr. Flowers teaches classes that involve vehicle dynamics. Much of his expertise involving issues related to this case comes from training and experience. For several years, Dr. Flowers has worked in a NHTSA funded project investigating rollover crashes, specifically in testing and design issues. He has conducted various computer simulation studies and scale model testing of rollover issues.

Currently, Dr. Flowers is involved in a study with Daimler Chrysler on vehicle electronics. He is also familiar with the mechanics and history of electronic vehicle control stability systems. Such a system was not installed on the subject vehicle. Dr. Flowers has submitted two peer review papers for publication dealing with vehicle suspension design. The record shows that at least one of those papers has been published by the Society of Automotive Engineers. As to the other peer reviewed paper, it is unclear whether it has been published yet, but it also explores various properties which influence rollovers. Also, Dr. Flowers is familiar with the "Forkenbrock and Garrott" report on the steering maneuver test used by Ford and those recommended and used by NHTSA. As to the vehicle in question, Dr. Flowers is familiar with the design of the suspension system of the 1995 Ford Explorer and has inspected the subject vehicle.

As noted previously, Ford has extensive objections to Dr. Flowers' qualifications. Particularly, Ford bases much of its objections on the fact that Dr. Flowers has not designed automobile suspensions for an automobile manufacturer and that he has not "tested" his theory or hypothesis.

5

An expert may testify who has general training, education and experience in the field in question without having to have been specifically trained in the particular specialized area in question. McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2nd Cir. 1995). "Disputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." McCullock, 61 F.3d at 1044. " 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.' " Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001).

Plaintiff points out that Flowers is not offering an opinion about how the suspension system should have been designed. Instead, Flowers offers his opinion as to the susceptibility of the link to bending fatigue and the resulting loss of stability of the vehicle when the link fails. This instability of the vehicle allegedly contributes to the likelihood of rollover crashes. These conclusions are directly related to the training, testing, and experience he has with his studies and publications, work with the NHTSA and Diamler Chrysler. Further, it appears that a similar conclusion could be reached, by a lay person, based solely upon the evidence provided to Ford during the NHTSA investigation. There is no merit to Ford's argument that Flowers' alleged lack of qualifications should bar him from offering expert testimony as to the failure of the stabilizer bar link and such failure's contribution to vehicle stability and rollover crashes.

Next Ford argues that Dr. Flowers should not be allowed to offer his opinion because his theories have not been tested. Nothing in the law requires the expert to show that he actually performed the test relied upon. Oddi v. Ford Motor Co., 234 F.3d 136, 160 (3rd Cir. 2000). "[W]hen the expert has not done original research, but rather has surveyed available literature and drawn conclusions that differ from those presented by the scientists who performed the original work." Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 597 (9th Cir. 1996). Further, "[u]nder the *Daubert* interpretation of F.R.E. 702, general acceptance is not a necessary condition to admissibility; expert scientific opinion is admissible if it

6

qualifies as 'scientific knowledge' and is therefore sufficiently 'reliable.'" Lust, 89 F.3d at 597.

Dr. Flowers performed original test and research regarding the tensile strength of the different sized links. He found that the 10mm link offers a significant improvement in resisting bending handling load stress. Further, Dr. Flowers offered generally accepted and recognized literature in the field to back up his analysis. The remainder of Dr. Flowers opinions are based upon his review of the literature, much of which was provided by Ford, computer simulations, and the result of the NHTSA investigation. At this point there is no reason to doubt that his methods or source material is unreliable or untestable.

Lastly, Ford argues that Dr. Flowers' ultimate conclusion is speculative. It should be noted, however, that Plaintiff has establish from various sources that the link was not altered or removed from the vehicle before the accident. Further, if the link broke during the accident, Dr. Flowers testified that the stabilizer bar would have shown some deformity, which it did not exhibit. The question of whether Dr. Flowers' conclusions are correct or the most plausible are all issues subject to cross examination by Defendant. As with Defendant's other objections to Plaintiff's expert, this one is also without merit.

The Court finds that without further evidence and a clear showing that such testimony is inappropriate that it should not be withheld from the jury. Based on the record before the Court at this time, Plaintiff's expert, Dr. Flowers (1) is qualified to testify; (2) his methodology is scientifically reliable; and, (3) depending on the question he is asked to answer, Dr. Flowers' testimony may assist the trier of fact. City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548 (11th Cir. 1998). At this point, the objections the Defendant has to Dr. Flowers' testimony is more a matter for cross-examination raising credibility issues than a basis to exclude. Therefore, Defendant's motion to exclude the testimony of Dr. Flowers' based on Daubert grounds (Doc. No. 36) is **DENIED.**

## II. SUMMARY JUDGMENT

Defendant also moves for summary judgment on Plaintiffs claims, arguing that Plaintiff has failed to set forth a *prima facie* case. (Doc. No, 36). It is generally accepted that

7

in most product liability, strict liability and negligence cases arising under Georgia law involving a defect in the manufacture of a product, expert testimony is required to establish proof of the defect. Argo v. Perfection Prod. Co., 730 F. Supp. 1109 (N.D. Ga. 1989); Aldride v. King's Colonial Ford, Inc., 550 S.E.2d 439 (Ga. App. 2001). Defendant argues in its motion that since Dr. Flowers' testimony should be excluded, Plaintiff could not establish the essential element of her case showing a defect in the manufacture of the vehicle. As this Court has refused to exclude Dr. Flowers' testimony, Plaintiff has defeated that argument.[1]

Lastly, Defendant makes a weak argument that it should be entitled to summary judgment because Plaintiff has failed to establish proximate cause. As Defendant correctly points out, liability may only be imposed in a case such as this when it is shown that the defect is the proximate cause of the injury. Talley v. City Tank Corp., 279 S.E. 264 (Ga. App. 1981). But, Defendant also concedes that proximate cause is generally a question for the jury. Talley, 279 S.E.2d at 269. As such, the Court believes that such a question is better left for a jury to determine in that Plaintiff has made out a *prima facie* case with regards to Defendant's motion.

The Court finds that Plaintiff has established sufficient evidence of a defect and that the defect was a proximate cause of the accident to warrant determination by a jury. Accordingly, Defendant's motion for summary judgment (Doc. No. 36) is **DENIED.**.

**SO ORDERED**, this __26th__ day of September, 2006.

/s/W. Louis Sands
**W. LOUIS SANDS, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[1]. Plaintiff maintains that she has established a defect based solely upon the admissions by Ford that are in the record, and that an expert is not necessary. The Court does not address this argument as it is unnecessary.

8